Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, JONATHAN KROSKEY

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN KROSKEY, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>LIFEMD, INC., a Delaware corporation,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**1) CAL. PENAL CODE § 638.51** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff JONATHAN KROSKEY ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant LIFEMD, INC., a Delaware corporation ("Defendant" or "LIFEMD"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.lifemd.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol ("IP") addresses, session data, and clickstream activity in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

//

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

5.     When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.     When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics / Tag Manager / DoubleClick)
- AppNexus Tracker
- TikTok Tracker

7.     The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.     The Trackers are operated by distinct third parties, including Google LLC (Google Trackers), AppNexus Inc. (Xandr Tracker), and TikTok Inc. (TikTok Tracker). Defendant aids, employs, agrees, and conspires with the Third Parties by enabling the Trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data-monetization activities.

9.     On information and belief, Defendant's Website is further equipped with additional third-party trackers that are pen registers and/or trap-and-trace devices or processes, including but not limited to those operated by Microsoft Corporation (Microsoft Ads and Clarity Trackers), Meta Platforms, Inc. (Facebook Pixel), Criteo SA (Criteo Tracker), Outbrain Inc. and Taboola Inc. (Outbrain/Taboola Trackers), LiveIntent Inc. (LiveIntent Tracker), PowerInbox Inc. (PowerInbox Tracker), Freshpaint Inc. (Freshpaint Tracker), Spotify USA Inc. (Spotify Pixels), AppLovin Corporation (AppLovin Tracker), Yahoo Inc. (Yahoo Tracker), X Corp. (Twitter Trackers), LegitScript LLC (LegitScript Tracker), and MediaWallah LLC (MediaWallah Tracker).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Collectively, these trackers capture and transmit Plaintiff's and Class Members' addressing, routing, and signaling information to multiple external parties without consent or court authorization, in violation of CIPA. Taboola, Inc., LiveIntent, Inc. and MediaWallah, LLC are registered California data brokers.

10.    Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, timezone, operating system, pages visited, session duration, scroll depth and/or mouse movement, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website. That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

11.    Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc*., 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

12.    The allegations here are made more invasive by the number and nature of the entities operating the Trackers and collecting Plaintiff's and Class Members' IP addresses and User Information. The Google Trackers (Analytics / Tag Manager / DoubleClick), AppNexus / Xandr Tracker, TikTok Tracker, Microsoft Ads and Clarity Trackers, Meta Tracker (Facebook Pixel), Criteo Tracker, Outbrain / Taboola Trackers, LiveIntent Tracker, Freshpaint Tracker, PowerInbox Tracker, Spotify Tracker, AppLovin Tracker, Yahoo Tracker, Twitter / X Trackers, LegitScript Tracker, and

MediaWallah Tracker each combine the information they collect about Website users with data obtained from other websites and digital properties. These entities add the IP addresses and User Information of Website visitors to their own cross-platform user profiles and use that aggregated data to track Plaintiff and Class Members across the Internet. Those composite profiles are then made available to advertisers and data-broker partners for targeted and tailored advertising, retargeting, identity resolution, and behavioral modeling across a broad universe of online activity.

13.   Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

14.   By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated CIPA § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

15.   Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.   **PARTIES**

16.   Plaintiff JONATHAN KROSKEY is a California citizen residing in Santa Clara County and has an intent to remain there. Plaintiff was in California when he visited the Website including on August 30, 2025, which occurred during the class period prior to the filing of the complaint in this matter. At the time of Plaintiff's recent visit(s), he was viewing the Defendant's Website for personal purposes. The allegations set forth herein are based on the Website as configured when Plaintiff visited it and such occasion(s), Plaintiff interacted with the Website's homepage (among others) which is where Defendant intentionally embedded the Trackers on Plaintiff's device for the purpose of sharing Plaintiff's personal signaling, routing, and addressing information as described herein.

//

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

17.    Defendant LIFEMD, INC. is a Delaware corporation that owns, operates, and/or controls the Website which is an online platform that offers goods and services to consumers.

18.    LIFEMD, INC. is a publicly traded telehealth company headquartered in New York, New York, with operations spanning multiple states. Through its flagship platform, lifemd.com, the company connects patients with licensed healthcare professionals for virtual consultations, diagnostics, and prescription management. LIFEMD has grown significantly in recent years, reflecting broader trends in the telemedicine industry and the shift toward digital healthcare delivery.

19.    LIFEMD employs a substantial workforce of medical providers, support staff, and corporate employees across the United States. Its business model focuses on offering subscription-based and on-demand health services that cover a range of areas, including primary care, men's and women's health, dermatology, weight management, and chronic condition support. Beyond patient care, the company also invests heavily in marketing and customer acquisition, relying on digital engagement strategies to drive growth.

20.    The Website is the centerpiece of LIFEMD's telehealth operations. It functions as the primary portal through which patients can access medical services, schedule appointments, manage prescriptions, and receive treatment plans. The platform emphasizes convenience, offering users streamlined account management, mobile accessibility, and integration with LIFEMD's subscription-based care programs. Its digital presence is essential to the company's ability to scale healthcare delivery nationwide.

21.    The Website is structured as a major hub for LIFEMD's business intelligence and marketing initiatives. Beyond facilitating patient care, the Website is designed to capture extensive data on users' interactions, preferences, and health-related inquiries. The site incorporates tracking technologies and third-party integrations that

monitor user activity across the platform. The information collected is used to generate profiles of visitors and to facilitate targeted advertising and promotional campaigns.

22.    The interception of communications occurred at the moment LifeMD's tracking and analytics code executed on Plaintiff's device within California, before any data left the state's borders. On such occasion or occasions, Plaintiff interacted with the Website's homepage (among other pages) where Defendant intentionally embedded third-party tracking technologies, including advertising pixels, analytics tags, and data-layer scripts, on Plaintiff's device for the purpose of capturing and transmitting Plaintiff's personal signaling, routing, and addressing information as described herein. Network records confirm that the Website's homepage automatically initiated outbound requests to multiple third-party domains, transmitting Plaintiff's behavioral metadata and identifiers from within California.

23.    LifeMD designed and maintained its Website as a fully interactive, commercial platform that solicits telehealth consumers throughout the United States, including California. The Website enables users located in California to complete medical intake forms, purchase consultations, and transmit payment and personal information directly through the site. Each of these functions constitutes a commercial transaction initiated by California users and creates direct, purposeful contact with this forum.

24.    At the time of Plaintiff's visit, the Website was configured to automatically execute embedded tracking code upon page load, causing Plaintiff's device located in California to establish outbound connections to the above-referenced analytics and advertising platforms. Those transmissions contained user metadata, including the full page URL, referrer path, and session identifiers, and occurred contemporaneously with page load before the data exited California's borders. These communications were initiated by LifeMD's code and delivered to remote advertising and analytics servers under its control or selection.

/ /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### III.    <u>JURISDICTION AND VENUE</u>

25.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

26.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff resides in this District; and (4) the injury to Plaintiff occurred within this District.

27.    This Court has personal jurisdiction over Defendant because Defendant engages in direct forum-targeting conduct. When a California user accessed the Website, the browser automatically connected to multiple third-party advertising, analytics, and behavioral-tracking endpoints, including lifemd.attn.tv (Attentive Mobile Inc.), analytics.tiktok.com (ByteDance Ltd.), analytics.twitter.com (X Corp., San Francisco), connect.facebook.net (Meta Platforms, Inc.), r.casalemedia.com (Index Exchange Inc.), segment.prod.bidr.io (Magnite Inc.), and sp.analytics.yahoo.com (Yahoo Inc.). These integrations show that the Defendant deployed marketing and analytics technologies designed to profile visitors and retarget California users across advertising exchanges. The inclusion of the Attentive SMS-marketing endpoint (lifemd.attn.tv)—operated by a company that maintains offices and operations in Los Angeles, California—demonstrates that the Defendant's site was configured to capture and commercialize user communications from California residents for behavioral-advertising purposes.[1]

28.    This Court has personal jurisdiction over Defendant because Defendant knowingly integrates California-based advertising operations. The Defendant integrated

---

[1] Attentive Mobile Inc. has corporate headquarters located in Los Angeles, CA; provider of SMS-marketing and behavioral-targeting services (https://www.attentivemobile.com/).

tracking technologies operated by entities headquartered or maintaining primary advertising operations in California, including Google LLC (Mountain View), X Corp. (San Francisco), Meta Platforms Inc. (Menlo Park), and Attentive Mobile Inc. (Los Angeles). The Website also communicated with ad-exchange domains r.casalemedia.com (Index Exchange) and segment.prod.bidr.io (Magnite), both of which publicly disclose peering and data-exchange infrastructure in Los Angeles and San Jose. By embedding these California-based technologies, user interactions originating in California were intercepted and processed by systems operating from within this state.

29.    This Court has personal jurisdiction over Defendant because Defendant exploits California infrastructure. The Website delivered content and advertising through multiple content-delivery networks, including Amazon CloudFront (d296b1gzk3kiqi.cloudfront.net,               d2hrivdxn8ekm8.cloudfront.net, d2q2jy3t71sszx.cloudfront.net,               df8nroy20256x.cloudfront.net, duwriicdzpsrh.cloudfront.net) and JSDelivr/Cloudflare (cdn.jsdelivr.net), each of which maintains active edge nodes in Los Angeles, San Jose, and Fremont, California.[2]

30.    This Court has personal jurisdiction over Defendant because Defendant knows or should have known of harm caused to California consumers by engaging in the practices described herein. By embedding advertising and analytics code operated by California companies and routing user data through California CDN edge infrastructure, the Defendant foresaw—and accepted—that the privacy impact of its conduct would occur within California. The site also loads resources from transcend-cdn.com (Transcend, a consent and privacy-management platform whose public documentation describes CCPA/CPRA workflows), further evidencing configuration to treat California residents as a distinct regulatory population whose data collection carries statutory obligations.

---

[2] AWS CloudFront map lists POPs in Los Angeles and San Jose (https://aws.amazon.com/cloudfront/features/#Global_Network); Akamai Technologies global locations show "Los Angeles, CA" and "San Jose, CA" (https://www.akamai.com/global-locations); Cloudflare network map includes Los Angeles and San Jose (https://www.cloudflare.com/network/).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## IV.    GENERAL ALLEGATIONS

### 1.    *The California Invasion of Privacy Act (CIPA)*

31.    Enacted in 1967, the California Invasion of Privacy Act is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

32.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

33.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

34.    Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

35.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

36.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

37.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

38.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

39.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

40.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long

been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

41.    Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. *See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).

42.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

43.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

44.    In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set cookies on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

45.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



46.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests,  to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, the User Information, is used to profile users and facilitate targeted advertising.

47.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

48.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

49.    An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ*

*Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (*e.g.*, 191.145.132.123). IPv4 is the traditional format of IP addresses and, because it has a finite amount of combinations, it is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[3]

50.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

51.     Public IP addresses are globally unique identifiers assigned by Internet Service Providers ("ISPs") that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

52.     Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

/ /

---

[3]  *See*, *e.g.*, *What is the Internet Protocol*, Cloudflare, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NetBeez (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

53.     In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

54.     The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

55.     An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone number that is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

56.     The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[4]

/ /

---

[4] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address.  So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

57.    Thus, the differences between public and private IP addresses are as follows:[5]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

---

[5] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

58.    A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

59.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

60.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

61.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[6]

62.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[7]

63.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[8] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their

---

[6] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[7] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[8] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

interests."[9] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[10] because "[c]ompanies can use an IP address … to personally identify individuals."[11]

64. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[12] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[13]

65. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[14]

66. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[15]

67. In addition to "reach[ing] their target audience with greater precision,"

---

[9] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[10] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[11] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[12] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[13] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[14] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[15] *Id.*

businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[16] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[17]

68.     In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[18] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[19]

69.     The collection of IP addresses here is particularly invasive here: As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[20]

70.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user,

---

[16] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

71.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[21]

72.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[22]

73.    Often times, third-party scripts are installed on websites "for advertising purposes."[23]

74.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[24]

75.    Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

76.    As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

---

[21] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.
[22] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[23] *Id*.
[24] *Id*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

77.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

78.    Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

79.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.    *The Use of Trackers or Beacons and Digital Fingerprinting***

80.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

/ /

81.    The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

82.    This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

83.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

84.    The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some

cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

85.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

86.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

87.    When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.    *Plaintiff And Class Members' Data Has Financial Value***

88.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[25]

/ /

---

[25] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

89.     Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[26]

90.     There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[27]

91.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[28]

92.     In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[29]

---

[26] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[27] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[28] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data.

[29] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

93.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[30]

94.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

95.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

## 5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent*

96.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

---

[30] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

97.     Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

98.     IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

99.     When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

/ /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**6.**     ***Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy***

100.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

101.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

102.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

103.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

**a.   Data Brokers And Real-Time Bidding: The Information Economy**

*Data Brokers*

104.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[31] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the

---

[31] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

105.   Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). Taboola, Inc., LiveIntent, Inc. and MediaWallah, LLC are registered California data brokers that operate trackers on the Website.

106.   "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[32] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[33]

107.   For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[34]

108.   Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[35]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S.

---

[32] SHERMAN, *supra*, at 2.

[33] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[34] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[35] SHERMAN, *supra*, at 1.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[36]

109.    This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[37]

110.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements.  Many

> industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive

---

[36] *Id.*
[37] *Id.* at 9.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[38]

111.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[39]

**Figure 4:**



112.  As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[40]

113.  Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[41]

114.  These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[42]

115.  In short, by collecting IP addresses, Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

116.  As a result of Defendant's installation of trackers operated by data brokers such as MediaWallah, LiveIntent and Taboola, together with numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is appended to existing profiles maintained by those brokers or used to generate new ones. This linkage is accomplished through the collection of IP addresses, device metadata, and other user information transmitted by the browsers of Defendant's Website visitors.

/ /

---

[40] *Id.* at 11.

[41] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[42] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

117.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

118.   Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

119.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[43]

120.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact."[44] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[45]

121.   In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like AppNexus help advertisers select which users to

---

[43] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.
[44] *Id.*
[45] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

advertise and target, and an Advertising Exchange is the platform on which all of this happens.

122.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, *e.g.*, AppNexus]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.   This information can be added to existing dossiers DSPs have on a user.[46]

**Figure 5:**



123.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest

---

[46] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[47]

**Figure 6:**



124.   In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users,

---

[47] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

125.    Likewise, a DSP like AppNexus can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

126.    All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

127.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

    a.    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

    b.    "send[ing] sensitive data across geographic borders."

    c.    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[48]

128.    Given AppNexus operates a DSP here, the last point is particularly relevant, as it means AppNexus collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

---

[48] Federal Trade Commission, Unpacking Real Time Bidding through FTC's case on Mobilewalla (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

129.  Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[49]

130.  For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[50]:

**Figure 7:**



131.  All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-

---

[49] Geoghegan, *supra*.
[50] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

132.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like MediaWallah, Taboola and LiveIntent who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website. The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

133.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[51] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[52]

134.    Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator*

---

[51] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[52] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

*advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[53]

**Figure 8:**



135.   Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2

---

[53] Papadopoulos, *supra*, at 1433.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[54]

136.   On the flip side, "CSync may re-identify web users even after they delete their cookies."[55] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[56] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[57]

137.   Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[58]

138.   Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

139.   To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build

---

[54] Papadopoulos, *supra*, at 1434.
[55] *Id.*
[56] *See id.*
[57] *Id.*
[58] *Id.* at 1441.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

140.    Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

141.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

142.    Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

143.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

/ /

144.   On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

145.   Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

146.   The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

147.   AppNexus performs identity enrichment, audience segmentation, and cross-device tracking functions that expand the scope of behavioral data captured through the Website. By linking browsing activity with pseudonymous identifiers and participating in real-time bidding and cookie-matching frameworks across advertising exchanges, AppNexus creates persistent, cross-context user profiles that extend beyond a single browsing session or device. AppNexus' tracking infrastructure synchronizes identifiers through its pixel and data-management platform, allowing behavioral data

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  collected on the Website to be merged with data from partner sites and third-party

2  sources. These processes convert raw routing and behavioral metadata transmitted from

3  the Website into monetizable, targetable audience segments distributed through Xandr's

4  programmatic advertising network.

5              V.    **SPECIFIC ALLEGATIONS**

6  *1.    **The Google Trackers***

7          148.    The Google Trackers are digital analytics and tag management technologies

8  operated by Google LLC, consisting of Google Tag Manager, Google Analytics, and

9  DoubleClick Ads. Together, these components enable Google and its affiliated

10  advertising and analytics services to collect detailed interaction data, monitor

11  engagement, and coordinate the deployment of additional tracking scripts across the

12  Website. Google Tag Manager functions as a container script that injects and executes

13  other tracking tags within the Website's code, including those associated with Google

14  Analytics and DoubleClick. Google Analytics measures and reports user behavior in

15  granular detail to facilitate audience profiling, marketing optimization, and targeted

16  advertising within Google's adtech ecosystem.

17          149.    When implemented on the Website, the Google Trackers collect a broad

18  array of user metadata, including the full page URL, page title, session timestamps,

19  referrer headers, and behavioral interaction data such as page views and navigation

20  paths. Google Analytics also captures detailed device and environment attributes,

21  including IP address, screen resolution, browser type, operating system, and language

22  settings. These data points are bound to persistent browser identifiers, enabling Google

23  to track users across multiple websites, sessions, and devices, forming longitudinal

24  behavioral profiles that are used for targeted advertising and measurement.

25          150.    The Google Trackers monitor user engagement signals on the Website,

26  including page views, link clicks, and navigation behavior, and transmit those interaction

27  signals to Google's analytics and advertising infrastructure. Google Analytics executes

28  through JavaScript calls to domains including www.google-analytics.com and

analytics.google.com, while Google Tag Manager initiates requests to www.googletagmanager.com during initial page render. Through this container, Google Tag Manager automatically deploys additional scripts, such as DoubleClick ad beacons to googleads.g.doubleclick.net, without any user action or consent.

151.  Figure 9 below shows a visible request labeled "<> gtm.js?id=GTM-…" with the corresponding URL recorded as "www.googletagmanager.com/gtm.js…[full URL omitted]", method "GET", status "200", domain "www.googletagmanager.com", type "script", and time "0 ms". Additional table entries display the text "Weight Loss", "Diabetes", and "Pink Eye" aligned under the same columns without associated URL, method, status, or domain values. The displayed data constitutes direct evidence of the network metadata defining the protocol, endpoint, and communication context for this transaction.

**Figure 9:**



152.  Figure 10 below shows a visible entry labeled "collect?e" with a recorded Request URL beginning "www.google.com/ccm/collect…[full URL omitted]," request method "POST," status code "200 OK," and remote address

43

"2607:f8b0:4007:817::2004:16." The displayed fields include "Headers," "Payload," "Preview," "Response," "Initiator," and "Timing," documenting the structure of the request. Text shown in the table includes "Weight Loss," "Psychiatric Care," "Urgent Care," "Diabetes," "High Cholesterol," "Nutrition," and "Pink Eye." The displayed data constitutes direct evidence of the network metadata defining the protocol, endpoint, and communication context for this transaction, with the visible condition terms representing behavioral metadata rendered by the webpage at the time of the request.

**<u>Figure 10:</u>**



155.    Figure 11 below shows two visible entries labeled "<> 10857167385/?r.." and "" 10857167385/?r." with corresponding URLs recorded as "googleads.g.doubleclick.net/pagead/…[full URL omitted]," method "GET," status "200," domain "googleads.g.doubleclick.net," type "script," and times "26 ms" and "28 ms." Text displayed in the same table includes "Weight Loss," "Psychiatric Care," "Urgent Care," "Diabetes," "High Cholesterol," "Nutrition," and "Pink Eye." The displayed data provides verifiable network records evidencing the transmission path, header configuration, and endpoint identification of the observed exchange, correlating

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

user-facing behavioral metadata with signaling and routing information recorded during the transaction.

**Figure 11:**



156.    Figure 12 below is a Fiddler network capture showing recorded HTTPS requests to analytics.google.com, including entries with status "204" and URL paths beginning "/g/colect…[full URL omitted]." Each entry records the request protocol, method, response status, and destination host as observed in real time during the browsing session. The capture preserves addressing, routing, and signaling metadata transmitted from the client browser to Google's analytics infrastructure, including behavioral metadata such as event identifiers ("en=page_view"), tracking identifiers ("tid=G-44GR303Q2D"), document location strings ("dl=https://lifemd.com/…"), and timing codes ("gtm=45je59n2v8…"). The displayed data establishes that outbound communications from the user's browser conveyed identifiable behavioral and session-level parameters to a Google-controlled endpoint through a live HTTPS connection initiated at page load.

/ /

45

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 12:**



14    157.    Figure 13 below shows DNS query and response records documenting

15  outbound and inbound communication between the client at source address

16  198.19.190.52 and resolver 198.19.0.2 for multiple Google-owned domains, including

17  content-autofill.googleapis.com, www.googletagmanager.com, analytics.google.com,

18  googleads.g.doubleclick.net, stats.g.doubleclick.net, google.com, and

19  passwordsleakcheck-pa.googleapis.com. Each entry records the query type, protocol,

20  and corresponding A or CNAME responses, including numerical host identifiers such as

21  142.251.163.95, 216.2, and 64.233.180.157, reflecting successive resolution events over

22  the session timeline. The displayed data constitutes direct evidence of addressing,

23  routing, and signaling metadata generated during live DNS resolution to Google-

24  controlled endpoints, establishing the network path and connection sequence through

25  which the client browser engaged multiple Google services during the session.

26  ///

27

28  ///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 13:**



158.  Figures 9 through 13 together depict the sequence of network activity demonstrating that LifeMD's website caused a user's browser in California to establish live connections with Google's analytics and advertising infrastructure without any user action or consent. Figure 9 shows the initial execution of Google Tag Manager upon page load, initiating the injection of additional Google scripts. Figure 10 records the outbound HTTPS request to Google's analytics endpoint, confirming transmission of parameters such as event identifiers, document locations, and session timing values. Figure 11 shows the stored cookies and network calls establishing that Google's advertising and analytics domains were contacted immediately upon entry to the site. Figure 12 captures the corresponding HTTPS communications between the browser and Google's analytics servers, recording unique identifiers, event names, and session variables. Figure 13 documents the DNS resolution process mapping multiple Google domains to specific server addresses, confirming the routing of outbound connections. The parameters visible across these captures are behavioral because they reflect how the user interacted with the website (what was viewed, when, and in what order) revealing

47

a continuous pattern of navigation and engagement. Together, these figures establish that LifeMD's embedded Google tracking code captured and transmitted users' addressing, routing, and signaling information, along with behavioral metadata, from within California to remote Google servers.

159.    Defendant surreptitiously installed and executed the Google Trackers onto users' browsers by embedding Google Tag Manager within the Website's source code. When a user visits the Website, their browser automatically executes this container, which dynamically loads Google Analytics and DoubleClick components. These scripts initiate outbound network requests to Google's servers, transmitting metadata including the full page URL, referrer information, browser details, and unique session identifiers, thereby enabling real-time profiling and participation in Google's advertising ecosystem.

160.    The Google Trackers are at least a *process* because they consist of software routines that identify consumers, gather data, and correlate that data for subsequent analysis and targeting.

161.    The Google Trackers are at least a *device* because software must operate on some form of computing hardware to function. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).*

162.    The Google Trackers function as pen registers and/or trap-and-trace devices within the meaning of the California Invasion of Privacy Act because they capture outgoing signaling data such as full URLs, referrer headers, timestamps, and session identifiers, and process corresponding inbound responses that contain analytics payloads and cookie values. These transmissions occur automatically upon page load and without any user participation, enabling Google to continuously log and associate browsing behavior with persistent identifiers.

163.    Defendant never obtained a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class

Members' express or implied consent to install or activate the Google Trackers on their browsers or to collect and transmit their communications to Google.

164. Accordingly, the Google Trackers violate the California Invasion of Privacy Act by operating as unauthorized pen registers and/or trap-and-trace devices without prior consent or court authorization.

## 2.    *The AppNexus Tracker*

165. The AppNexus Tracker is a digital advertising and identity-exchange technology operated by AppNexus Inc. (doing business as Xandr) through domains including acdn.adnxs.com and ib.adnxs.com. It enables external advertising networks to receive data from the Website, synchronize identifiers, and measure user activity across domains. The AppNexus "pixie.js" script executes automatically during the initial page load and coordinates subsequent requests to AppNexus servers for data enrichment and audience matching.

166. When implemented on the Website, the AppNexus Tracker collects a range of user metadata, including the full page URL, referrer header, session identifiers, user-agent string, and timing data associated with each request. These data points are linked to a persistent browser identifier such as "XANDR_PANID," allowing AppNexus to connect multiple sessions from the same user and build longitudinal behavioral profiles across websites participating in the same exchange infrastructure.

167. The AppNexus Tracker monitors network connections initiated during page render and transmits those interaction signals to AppNexus's servers through HTTPS requests. Captured evidence shows that scripts named "pixie.js" and "up?pi=…" execute automatically upon visiting the Website, generating network calls to ib.adnxs.com and acdn.adnxs.com that complete with "200 OK" status responses. These transmissions occur without any user input and begin immediately upon the initial page request.

168. Figure 14 below shows four entries labeled "pixie.js," "pixie?e=PageVie…," "up?pi=5f5129f1-...," and "bounce?%2Fsetu…," each with corresponding                     URLs                 beginning                 respectively

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  "https://acdn.adnxs.com/dmp/up/pixie.js…[full                    URL                    omitted],"
2  "https://ib.adnxs.com/pixie…[full                  URL                omitted]," and
3  "https://ib.adnxs.com/bounce…[full URL omitted]." Each request records the method
4  "GET," status "200," domains "acdn.adnxs.com" and "ib.adnxs.com," types "script" or
5  "gif," and completion times ranging from "0 ms" to "66 ms." Text present in the same
6  display includes "Weight Loss," "Psychiatric Care," "Urgent Care," "Diabetes," "High
7  Cholesterol," "Nutrition," "Pink Eye," and "Insomnia." The displayed data constitutes
8  direct  evidence  of  the  network  metadata  defining  the  protocol,  endpoint,  and
9  communication  context  for  these  transactions,  evidencing  addressing,  routing,  and
10  signaling information exchanged between the client browser and the identified remote
11  hosts operated by AppNexus.

12                                **Figure 14:**



25      169.    Figure 15 below shows a structured list of stored browser data fields with
26  paired  values  identifying  cookies  and  identifiers  associated  with  multiple  domains,
27  including      "lifemd.com,"    ".lifemd.com,"    ".criteo.com,"    "taboola.com,"    and
28  ".adnxs.com."  Visible  entries  include  "heatIdvUpdate  1758792522083,"  "_lc2_fpi

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1bffc9d79af0," "cto_bundle Sgzl-V9FZTFDc," "ph_phc_pWa9liz %7B%22distinc," "Ot_gid b7573658-80b.," and "XANDR_PANID w2-ybPmf0_KK..," each accompanied by associated size and expiration metadata. The displayed data constitutes direct evidence of the network metadata defining the protocol, endpoint, and communication context for these stored identifiers, documenting the addressing and signaling relationship between the user's browser and the listed domains.

**<u>Figure 15:</u>**



170. Figure 16 below shows recorded HTTPS requests to multiple hosts, including "hsr.heatmapcore.com," "ib.adnxs.com," "id-msp.newsbreak.com," and "kinesis.heatmap.com," with response codes of "200" and "101." The visible URL paths include "/Pdata=JTdCJTycmvVxdWVzdfFRpbWUMjIMEMjyNSUyRNICCU…[full URL omitted]," "/pixie/up…[full URL omitted]," "/pixie?e=PageVie…[full URL omitted]," "/sync-nbu?source=2&host=lfemd.com," "/khsrv/v1," and "/data." Additional visible metadata fields contain the values "Sec-Fetch-site: cross-site," "Sec-Fetch-Mode: no-cors," and "Sec-Fetch-Dest: image." The displayed data provides verifiable network records evidencing the transmission path, header configuration, and

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

endpoint identification of the observed HTTPS exchanges between the client browser and the identified domains.

**Figure 16:**



171.  Figure 17 below shows DNS query and response records documenting communication between source address 198.19.190.52 and resolver 198.19.0.2 for the hostnames "acdn.adnxs.com" and "ib.adnxs.com." Each query entry identifies the protocol as "DNS" and includes paired responses showing "CNAME cdn.adnxs.com.akamaized.net" and "CNAME xandr-g-geo.trafficmanager.net." The displayed data constitutes direct evidence of addressing, routing, and signaling metadata generated during live DNS resolution to the AppNexus domain infrastructure, confirming the path and endpoint resolution process connecting the client system to adnxs.com network resources.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 17:**



172. Figures 14 through 17 together show that LifeMD's website caused a visitor's browser to make live connections with AppNexus's advertising and identity infrastructure the moment the page was opened. Figure 14 reflects the initial JavaScript and image requests made to AppNexus domains showing the automatic loading and execution of a file labeled "pixie.js" and several follow-up requests that use identifiers like "pi=5f5129f1…" tied to the session. Figure 15 captures the persistent storage of a corresponding cookie named "XANDR_PANID" from the same domain, which functions as a unique browser identifier. Figure 16 shows that these network exchanges occurred simultaneously with additional connections to other external hosts, confirming that the user's device transmitted data to multiple third-party endpoints during a single visit. Figure 17 documents the DNS resolution chain for acdn.adnxs.com and ib.adnxs.com, revealing the network path through which the browser located and communicated with the AppNexus servers. Taken together, these figures illustrate how the AppNexus Tracker captured a record of the user's online session at the point of access, linking it to a persistent identifier stored on the device. The information

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

transmitted, including unique IDs, timestamps, and domain-level connection metadata, reflects behavioral indicators because it ties browser activity, timing, and interaction context to a specific user profile. This kind of cross-session behavioral metadata allows an advertising entity to follow a user's navigation patterns across websites, undermining expectations of privacy in one's individual browsing conduct.

173.    Defendant surreptitiously installed and executed the AppNexus Tracker onto users' browsers by embedding AppNexus scripts within the Website's source code. When a user visits the Website, their browser automatically executes this code, initiating outbound HTTPS requests to AppNexus servers and transmitting metadata including the full page URL, referrer information, browser details, session identifiers, and cookie values, enabling real-time profiling and participation in external advertising exchanges.

174.    The AppNexus Tracker is at least a process because it consists of executable code that identifies consumers, gathers data, and correlates that data across browsing sessions.

175.    The AppNexus Tracker is at least a device because software must operate on a computing medium to function. See *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

176.    The AppNexus Tracker functions as a pen register and/or trap-and-trace device within the meaning of the California Invasion of Privacy Act because it captures outgoing signaling data such as full URLs, referrer headers, timestamps, and cookie identifiers and processes corresponding inbound responses that contain HTTP payloads and session tokens. These transmissions occur automatically upon page load and without user participation, enabling AppNexus to log, associate, and correlate browsing behavior with persistent identifiers across network contexts.

177.    Defendant never obtained a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install or activate the AppNexus Tracker on their browsers or to collect and transmit their communications to AppNexus.

178.    Accordingly, the AppNexus Tracker violates the California Invasion of Privacy Act by operating as an unauthorized pen register and/or trap-and-trace device without prior consent or court authorization.

### 3.    The TikTok Tracker

179.    The TikTok Tracker is a behavioral analytics and advertising pixel technology operated by TikTok Inc., implemented on the Website through JavaScript requests to domains such as analytics.tiktok.com and analytics-ipv6.tiktokw.us. When a user loads the Website, the browser automatically executes code initiating outbound HTTPS communications with TikTok's analytics servers. These communications transmit user and session metadata that allows TikTok to record and correlate browser activity with identifiers maintained in its advertising infrastructure.

180.    The TikTok Tracker captures metadata including the page URL, document title, referrer information, and user agent string, as well as behavioral indicators such as page views, engagement events, and timing data. The visible request parameters include event identifiers (for example "en=page_view"), tracking identifiers ("sdkid=C8T29K7V9S6N3MLDGFA0"), and environmental variables identifying the device, browser, and operating context. The information transmitted in these requests links browsing behavior on the Website with TikTok's external analytics and advertising systems.

181.    When executed within the browser, the TikTok Tracker loads scripts labeled "events.js" and "enrich_ipv6" from TikTok-controlled hosts. These scripts record session timestamps and network identifiers associated with the visitor's activity. The exchange occurs through live HTTPS connections, establishing a continuous flow of outbound and inbound packets between the user's browser and TikTok's analytic infrastructure.

182.    Figure 18 below shows multiple HTTPS requests to analytics.tiktok.com, including URLs beginning with "https://analytics.tiktok.com/i18n/pixel/static/…" and "https://analytics.tiktok.com/api/v2/pixel…[full URL omitted]." Visible entries include

scripts labeled "main.MTE5N," "identify_47d," and "events.js?sdk," as well as POST requests to paths containing "/api/v2/pixel" and "/api/v2/pixel/act." Each request displays method "GET" or "POST," status "200," and domain "analytics.tiktok.com." Recorded transfer activity notes "7 / 443 requests," "8.9 kB / 4,890 kB transferred," and "20.7 kB / 5,695 kB resources." The displayed data constitutes direct evidence of the network metadata defining the protocol, endpoint, and communication context for this transaction, documenting the addressing and signaling sequence through which the browser established and maintained live HTTPS connections with TikTok's analytics infrastructure.

**Figure 18:**



183.   Figure 19 below shows multiple HTTPS requests to analytics.tiktok.com, each recorded with protocol "HTTPS," status "200," and host "analytics.tiktok.com." These entries appear in succession alongside corresponding request identifiers, evidencing repeated communications with the same TikTok-controlled endpoint. The displayed data constitutes direct evidence of addressing, routing, and signaling metadata

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

documenting how the browser initiated and maintained live HTTPS connections with analytics.tiktok.com during the session.

**Figure 19:**



184.    Figure 20 below shows header and cookie fields for a request labeled "events.js?s.." directed to a TikTok domain, with visible entries including "Server: nginx," "Server-Timing: inner; dur=3," and "Set-Cookie: Domain=tiktok.com; ttp=32nX1EX6qFo7jBouUCKMiWw0HgE; Secure; SameSite=None." Additional parameters such as "X-Akamai-Request-Id," "X-Cache: TCP_MISS," and "X-Tt-Logid" are also shown. The displayed data captures the signaling and header metadata exchanged between the browser and TikTok's server, documenting the configuration and routing details of the connection.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 20:**



185.   Figure 21 below shows DNS activity containing two queries and two responses associated with the domain analytics.tiktok.com and the related host analytics-ipv6.tiktokw.us. Each entry records source 198.19.190.52 and destination 198.19.0.2 using the DNS protocol, with corresponding query and response messages specifying CNAME values analytics.tiktok.com.ttdns2.com and analytics-ipv6.tiktokw.us. The displayed data documents the addressing and routing sequence through which the browser resolved and connected to TikTok's analytics infrastructure during the session.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 21:**



186.    Figures 18 through 21 together show that the Website caused the user's computer to contact TikTok's servers in the background while the page was loading. Figure 18 shows the beginning of this process, where the Website's code loaded TikTok's "events.js" and "pixel" files through TikTok web addresses, prompting the browser to connect directly to TikTok. Figure 19 shows that the browser then exchanged data with TikTok's domain, meaning that while the user viewed the Website, their browser was also sending and receiving information from TikTok's systems without any action or awareness by the user. Figure 20 confirms that these connections continued during the session, with multiple HTTPS requests showing an ongoing exchange of data. Figure 21 shows the network lookup activity that made these exchanges possible, where the browser located TikTok's servers by name through DNS queries to "analytics.tiktok.com" and "analytics-ipv6.tiktokw.us." The information shown in Figures 18 through 21 is behavioral and private because it reflects what a person is doing, viewing, and interacting with on the Website in real time. Each connection to TikTok's analytics servers includes metadata identifying when the user visited, what pages were

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

loaded, and how their browser and device responded — information that can be used to reconstruct the user's behavior during that session. These communications are not limited to technical data; they reveal the user's browsing activity and engagement with specific topics or services, tying those actions to a unique device or session identifier. This type of data goes beyond ordinary website operation because it describes how the user interacts with the site moment by moment.

187.    Defendant embedded the TikTok Tracker within the Website's source code, causing its automatic execution upon page load. When a user visited the Website, the browser silently initiated network connections to TikTok's servers, transmitting metadata including the page URL, referrer information, session timestamps, and unique session identifiers. These transmissions enabled real-time collection of behavioral and session-level data by TikTok without the user's knowledge or authorization.

188.    The TikTok Tracker is at least a process because it consists of software routines that identify consumers, gather data, and correlate that data for subsequent analysis and targeting.

189.    The TikTok Tracker is at least a device because software requires a computing mechanism for execution. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 (N.D. Cal. Nov. 8, 2023).

190.    The TikTok Tracker functions as a pen register and/or trap-and-trace device within the meaning of the California Invasion of Privacy Act because it records outgoing signaling information such as URLs, headers, timestamps, and session identifiers and captures corresponding inbound response data from TikTok's servers. These communications occur automatically upon page load and allow TikTok to continuously log and associate browsing behavior with persistent identifiers.

191.    Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device and did not obtain Plaintiff's or Class Members' express or implied consent to install or activate the TikTok Tracker on their browsers or to collect and transmit their communications to TikTok.

192.   Accordingly, the TikTok Tracker violates the California Invasion of Privacy Act by operating as an unauthorized pen register and/or trap-and-trace device without prior consent or court authorization.

## VI.   <u>CLASS ALLEGATIONS</u>

193.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

194.   The Class does not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

195.   Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

196.   **NUMEROSITY:**  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

197.   **COMMONALITY:**  Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;

- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;

/ / /

- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

198.  **TYPICALITY:**  As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

199.  **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

200.  **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII.    <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

201.  Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

202.  Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

203. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

204. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Statutory damages pursuant to CIPA;

6. Prejudgment interest;

7. Reasonable attorney's fees and costs; and

8. All other relief that would be just and proper as a matter of law or equity.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

2 ## <u>DEMAND FOR JURY TRIAL</u>

3    Plaintiff hereby demands a trial by jury on all causes of action and issues so

4 triable.

5 Dated:   November 21, 2025        Respectfully submitted,

6                                 **NATHAN & ASSOCIATES, APC**

7

8                     By: /s/ Reuben D. Nathan
                          Reuben D. Nathan, Esq. (SBN 208436)
9                          2901 W. Coast Hwy., Suite 200
                          Newport Beach, CA 92663
10                         Office: (949) 270-2798
11                         Email: rnathan@nathanlawpractice.com

12                         **LAW OFFICES OF ROSS CORNELL, APC**
13                         Ross Cornell, Esq. (SBN 210413)
                          P.O. Box 1989 #305
14                         Big Bear Lake, CA 92315
15                         Office: (562) 612-1708
                          Email: rc@rosscornelllaw.com
16

17                         *Attorneys for Plaintiff and the Putative Class*
18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED